UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA, ex rel. 3DQA, LLC

Relator,

MICHAEL RAPPACH and BOBI LEKIC

Plaintiffs,

v. Case No: 2:26-cv-1896-KCD-NPM

THEKEN COMPANIES, LLC,

Respondent,

RANDALL THEKEN, NEXTSTEP ARTHROPEDIX, LLC, SLICE MFG, LLC n/k/a THEKEN PORT PARK, LLC,

Defendants.

---

**ORDER**

Relator 3DQA, LLC brings this False Claims Act ("FCA") suit against the Theken Companies, LLC, Randall Theken, NextStep Arthropedix, LLC, and Slice MFG, LLC (collectively "Defendants"). The complaint accuses Defendants of funneling illegal kickbacks to surgeons under the guise of product development royalties. Michael Rappach and Bobi Lekic, former

employees of Defendants, also bring a retaliation claim alleging that Defendants orchestrated false criminal charges for stealing company records. (Doc. 42.)[1] Defendants now move to dismiss the complaint. Their primary arguments are that the first-to-file rule bars the qui tam allegations and the anti-retaliation provision of the FCA does not provide a cause of action for former employees. (Doc. 71.) The Court agrees with both, so the motion is **GRANTED**.

## I. Background

Like all FCA cases, the story begins with Defendants defrauding the United States. The scheme is relatively straightforward. The medical device company Theken—through its subsidiaries NextStep and Slice—manufactured a total hip arthroplasty system used in hip replacement surgeries ("iNSitu System"). They also paid royalty fees to the surgeons who contributed to its development (the "Surgeon Consultants").

These royalty fees are subject to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), (g), which prohibits any entity from making payments to induce a person to purchase an item that may be bought under a Federal health care plan. To avoid violating the Anti-Kickback Statute (and in turn the FCA), Defendants used Royalty Agreements with the Surgeon Consultants. (Doc. 42

[1] Unless otherwise indicated, all internal quotation marks, citations, and alterations have been omitted in this and subsequent citations.

at ¶¶ 45–46, 48.) The agreements were designed to fall within the Anti-Kickback Statute's personal services safe harbor by setting the Surgeon Consultants' compensation based upon their contribution to the iNSitu System before any development began. (*Id.* ¶¶ 46, 48.)

In reality, the compensation was designed to align with each surgeon's expected order volume of the iNSitu System. And any payments were contingent upon ordering the product for their own patients. (*Id.* ¶ 50.) Defendants' internal sales and royalty data even reflect that once the surgeon reflected a low return on investment, they would "harass" the surgeon and ask them to be "committed to the company and working hard with us every week on cases and feedback." (*Id.* ¶¶ 54–55.) Once Defendants felt as though the surgeons were no longer providing the appropriate return on investment, they stopped the royalty payments altogether. (*Id.* ¶¶ 53, 59–65.)

Apart from that financial arrangement, Defendants' manufacturing of the iNSitu System allegedly contained two issues. First, the acetabular cups contained less aluminum than required under Advancing Standards Transforming Markets ("ASTM") F136. (*Id.* ¶¶ 68–69.) Second, the iNSitu System did not comply with the tensile strength requirements of ASTM E8/E8M. (*Id.* ¶ 70.)

Because of the above scheme, 3DQA filed this FCA lawsuit on February 14, 2022, at 2:47 PM. (Doc. 2 at 1.) But they were not the first. Just 18 minutes

earlier, a related lawsuit was filed (Doc. 72-3 at 1) based upon the same Royalty Agreements. *See United States ex rel. Fries v. NextStep Arthropedix, LLC*, No. 2:22-cv-98-KCD-NPM (M.D. Fla. filed Feb. 14, 2022).

Once the Department of Justice disclosed the existence of this lawsuit to Defendants, they pegged Rappach and Lokic as the perceived whistleblowers. (Doc. 42 at ¶¶ 83–85.) Within a month of the DOJ's disclosure—and more than four years after Rappach and Lekic were no longer employees—Defendants contacted authorities in Ohio to bring criminal charges. (*Id.* at ¶ 87.) A police report was made, and several months later Rappach and Lekic were indicted for, among other things, stealing documents. (*Id.* at ¶¶ 87–88.) That criminal case is ongoing.

## II. Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient facts, accepted as true, to state a facially plausible claim for relief." *Galette v. Goodell*, No. 23-10896, 2023 WL 7391697, at *3 (11th Cir. Nov. 8, 2023). "A claim is facially plausible if it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The question here is not whether the plaintiff will ultimately win, but simply whether the complaint can proceed into discovery.

As this stage, we must accept the complaint's factual allegations as true and construe them in the light most favorable to the plaintiff. *Erickson v.*

*Pardus*, 551 U.S. 89, 93–94 (2007). That benefit of the doubt, however, has limits. The Court need not accept legal conclusions dressed up as factual allegations. *Bell Atl. Corp v. Twombly*, 550 U.S 544, 555 (2007). A pleading that offers nothing more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not unlock the courthouse doors. *Id.* In other words, the plaintiff must tell a factual story that makes the defendant's liability *plausible*, not just point a finger and recite the law. *See, e.g.*, *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

"We use a two-step process to determine whether a claim survives Rule 12(b)(6) scrutiny." *Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, 147 F.4th 1341, 1346–47 (11th Cir. 2025). First, "we determine what must be plead for each cause of action. . . . Then, we consider the well-pleaded factual allegations . . . to determine whether they plausibly suggest an entitlement to relief." *Id.*

## III. Discussion

### a. False Claims Act

First, Defendants argue that the first-to-file rule bars Plaintiffs' FCA claim because the related *Fries* action alleges the same scheme. (Doc. 71 at 9–14.) Plaintiffs respond that the first-to-file rule does not apply because its complaint "alerted the government to a broader, more pervasive, and distinct scheme." (Doc. 90 at 6.) The Court agrees with Defendants.

The FCA is clear: "if you ain't first, you're last." *Talladega Nights: The Ballad of Ricky Bobby* (Columbia Pictures 2006). In more legal terms, "[w]hen a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). The first-to-file bar eliminates "parasitic plaintiffs who piggyback off the claims of a prior relator, and [] encourage[s] legitimate relators to file quickly by protecting the spoils of the first to bring a claim." *See Cho ex rel. States v. Surgery Partners, Inc.*, 30 F.4th 1035, 1040 (11th Cir. 2022).

To determine whether qui tam actions are related, the Eleventh Circuit adopted the "same material elements test." *Id.* at 1042. The gist of the test requires the Court to compare the two complaints[2] "side-by-side and ask[] whether the later complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint." *Id.* The claims need not be identical, but only "related." *Id.*

Though Plaintiffs' Amended Complaint in this case contains slight differences, it alleges the same scheme the government was equipped to investigate based on the *Fries* complaint. Both pleadings concern Defendants

---

[2] The Court may take judicial notice of the *Fries* complaint to establish the content of those allegations without converting the motion to dismiss to a motion for summary judgment. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999). As such, Defendants' motion for judicial notice and/or incorporation by reference (Doc. 72) is **GRANTED**.

paying royalties and/or consulting fees to surgeons based on percentage of sales rather than any intellectual property contributions to the iNSitu System. These payments were designed to induce the surgeons to increase ordering volume. And Theken was the principal behind the scheme since he controlled the subsidiary corporations. Regardless of the addition of new defendants here, the Government was not put on notice of some "broader, more pervasive, or distinct scheme." The Government would have discovered such actors from *Fries* since the new defendant is simply some "corporate relative or affiliate of the earlier-named defendants." *See Cho*, 30 F.4th at 1043–44.

Nor do 3DQA's allegations that the iNSitu System contains insufficient aluminum content and failed to comply with the tensile strength requirements save the complaint. Regardless of those alleged defects, the thrust of 3DQA's allegations remain the same. Defendants induced the Surgeon Consultant to purchase the iNSitu System through the royalty fees paid under the Royalty Agreement. These alleged defects alone are not enough to have put the government on notice of some broader, more pervasive, or distinct scheme. *See, e.g.*, *United States v. Millennium Physician Grp.*, No. 2:16-CV-798-JLB-KCD, 2023 WL 2022228, at *5 (M.D. Fla. Feb. 15, 2023).

In a last-ditch effort to circumvent the first-to-file rule, Plaintiffs seek to consolidate their case with the *Fries* action. (Doc. 62; Doc. 91.) But their creative lawyering fails. This is because consolidation enables more "efficient

case management while preserving the distinct identities of the cases and the rights of the separate parties in them." *See Hall v. Hall*, 584 U.S. 59, 67 (2018); *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998). In other words, the cases are still distinct and the first-to-file rule applies. By losing the race to the courthouse—even if by 18 minutes—Plaintiffs are simply out of luck. So, Count I is dismissed with prejudice.

**b. Retaliation**

Next, Defendants argue the retaliation claim fails because, among other things, there is no cause of action for post-employment retaliation. (Doc. 71 at 23.) The Eleventh Circuit has not interpreted what "employee" means in the FCA's anti-retaliation provision. That leaves this Court to navigate a circuit split: the FCA covers retaliation against former personnel (Sixth Circuit), or the FCA is limited to current employees (Tenth Circuit). *See Potts v. Ctr. for Excellence in Higher Educ.*, 908 F.3d 610 (10th Cir. 2018); *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428 (6th Cir. 2021).

As always, when dealing with a question of statutory interpretation, the analysis principally turns on the text. *See United States v. Moore*, 115 F.4th 1370, 1374 (11th Cir. 2024). "[C]ourts must interpret the relevant words of a statutory provision not in a vacuum, but with reference to the statutory context, structure, history, and purpose of the law." *Perez v. Owl, Inc.*, 110 F.4th 1296, 1308 (11th Cir. 2024). Thus, to determine whether the FCA's anti-

retaliation provision applies to former employees, the Court looks to the text, then to the broader statutory structure, and if necessary, to the congressional purpose of the FCA.

The FCA's anti-retaliation provides, in relevant part:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment[.]

31 U.S.C. § 3730(h)(1).

The Court finds that "employee" is not ambiguous and only includes individuals who were current employees when the retaliation occurred. This is so for two simple reasons. First, the statute provides a temporal qualifier for "employee." And second, the available remedies for retaliation support limiting the provision to current employees.

The temporal qualifier for "employee" is revealed in the retaliatory acts outlined in the statute. There, the subsection identifies six categories—*i.e.*, discharge, demotion, suspension, threats, harassment, or any other manner of discrimination in the terms and conditions of employment. *See* 31 U.S.C. § 3730(h)(1). Of those categories, four must occur during employment because an employer cannot discharge, suspend, demote, or discriminate against a former employee in the terms and conditions of employment. This temporal

qualifier informs the Court how the remaining, open-ended terms should be construed.

The associated-words canon instructs us to restrict the meaning of a term when several verbs "are associated in a context suggesting that the words have something in common[.]" Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012). Since Congress placed "threatened" and "harassed" alongside "discharged, demoted, suspended, . . . or . . . discriminated against in the terms and conditions of employment," the Court cannot read "threatened" and "harassed" to encompass retaliation that may occur years after employment concludes. While true threats and harassment can naturally continue past employment, a majority of other district courts agree with this reading. *See, e.g.*, *Potts*, 908 F.3d at 613–16; *William Beaumont Hosp.*, 993 F.3d at 438 n.2 (Griffin, J., dissenting) (collecting cases); *Fitzsimmons v. Cardiology Assocs. Of Fredericksburg, Ltd.*, No. 3:15CV72, 2015 WL 4937461, at *7 (E.D. Va. Aug. 18, 2015) (collecting cases).

The *ejusdem generis* canon also applies to the catchall phrase at the end of the statute's enumeration—the specific categories of retaliatory actions. *See* Scalia & Garner, *supra* at 199. Where a catchall phrase is used, it generally implies adding similar items after the word "other." *Id.* For example, imagine a list of "dogs, cats, horses, cattle, and other animals." *Id.* No reasonable person

would suggest that in context of the entire list, "other animals" would include the Florida Panther, the West Indian Manatee, or even the Florida scrub-jay. *Id.* As with the FCA's residual clause, it cannot be said that when considering the retaliatory actions listed, that a reasonable person would read it to cover retaliation occurring outside the employment relationship.

In a similar vein, the remedies listed in § 3730(h)(2) also show the statute only covers current employees. The relief includes "reinstatement with the same seniority status . . ., 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination[.]" 31 U.S.C. § 3730(h)(2). Just as with the retaliatory acts, the first three forms of relief—*i.e.*, reinstatement, back pay, and interest on back pay—clearly describe a current employment relationship when the retaliation occurs. It is impossible, nor would it be logical, for a former employee who may endure some later retaliation to obtain these remedies since they will be unable to prove the requisite but-for causation. *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1360 (11th Cir. 2020). Further, simply because "shall include" permits other unspecified relief, it would be improper for the Court to construe it to reach beyond employment-related relief given the statute's emphasis on the employment relationship.

Since both Rappach and Lekic were not—nor could they have been—current employees of Defendants at the time criminal charges were sought,

there can be no retaliation claim under the FCA. Accordingly, Count II is also dismissed with prejudice.

## IV. Conclusion

The FCA offers no consolation prize for those who lose the race to the courthouse. Nor does it provide a remedy for alleged retaliation occurring after a plaintiff is no longer employed by the defendant. As such, the Court **GRANTS** Defendants' motion to dismiss (Doc. 71) and Defendants' motion for judicial notice and/or incorporation by reference (Doc. 72). Counts I and II are **DISMISSED WITH PREJUDICE**.

Without either claim proceeding, there is no reason for the Court to consolidate this action with the related *Fries* action. Thus, the Motion to Consolidate Cases (Doc. 62) and Motion to File a Consolidated Amended Complaint (Doc. 91) are **DENIED**.

The Clerk is directed to enter judgment accordingly, terminate all pending deadlines, and close the file.

**ORDERED** in Fort Myers, Florida on September 15, 2026.

Kyle C. Dudek
United States District Judge